UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOSEPH PETER SCHMITT | ) | |
| | ) | |
| | ) | |
| v. | ) | C.A. No. 2004-10717-RWZ |
| | ) | |
| JEFFREY SMITH, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

I.   Introduction

The plaintiff pro se, Joseph P. Schmitt ["Schmitt"], was convicted and sentenced to serve four to eight years in the custody of the Massachusetts Department of Correction [the "Department"]. Schmitt filed the instant complaint dated March 25, 2004, alleging that the procedures by which he was found guilty of two prison disciplinary matters, one in December of 2001 and the other in March of 2002, while an inmate at MCI-Cedar Junction, violated his procedural due process rights.

On August 9, 2002, Schmitt's criminal sentence expired and he was transferred to the Massachusetts Treatment Center where he is currently an involuntarily civilly committed person adjudged to be sexually dangerous under Massachusetts law. Schmitt's complaint also appears to challenge the Department's authority to prohibit him from possessing or mailing sexually explicit material involving young men or children while housed at the Treatment Center.

2

Specifically, Schmitt asserts that his First and Eighth Amendment rights are violated and that his "right against sexual discrimination guaranteed by the Massachusetts Declaration of Rights" is violated by the institution's disciplinary rules. He cites 42 U.S.C § 1983 and Mass. Gen. Laws, c. 231A and c. 214, §1 as the jurisdictional basis of his claims.

The named defendants include the Massachusetts Department of Correction, Peter Allen, the former Superintendent of MCI-Cedar Junction, Ernest Therien and William Faria, respectively the disciplinary officer and hearing officer at MCI-Cedar Junction, and Patrick Mulvey and William Grossi, both inner perimeter security officers at the institution. Each is purportedly sued in their official and individual capacities.

II.     Statement of Undisputed Fact

Schmitt was convicted of two counts of rape of a child and sentenced to serve four to eight years in the custody of the Massachusetts Department of Correction.[1] During 2002, he was incarcerated at MCI-Cedar Junction, a maximum security institution.[2]

On October 24, 2001, Schmitt received a prison disciplinary report charging him with, inter alia, violating the following prison disciplinary rules:

| | |
|---|---|
| #2 | violating any departmental rule or any other rule, regulation, or condition of an institution or community based program; |
| #25 | giving money or any item of value to, or accepting money or any item of value from another inmate, a member of his family or his friend without authorization; |
| #29 | extortion, blackmail, protection; demanding or receiving money or anything of value in return for any reason.[3] |

---

[1]     Affidavit of Robert Murphy, paragraph 4. The Murphy Affidavit is submitted separately herewith.

[2]     Id.

[3]     Certified Administrative Record of Disciplinary Report 01-1583, pages 17 and 18. The Certified Administrative Record is submitted separately herewith. Pages 39-82 of the Record contain the letters in issue and those pages are included in the court's copy of the Record but have been removed from a copy provided to Schmitt.

3

The report explained that an investigation concluded Schmitt authored correspondence to various individuals containing abusive, obscene acts with minors of a sexual nature and that the letters or stories were authored for the purpose of financial gain. The report described how from August 27, 2001, through September 3, 2001, Schmitt sent and received illicit correspondence and received payment for sexually explicit stories pertaining to sexual acts with a child.[4]

On December 13, 2001, a prison disciplinary hearing was held before a disciplinary hearing officer.[5] The evidence included testimony from Schmitt, during which he admitted receiving payment for writing pornographic stories the content of which refers to sex with children, and testimony from the reporting officer.[6] The documentary evidence included Schmitt's inmate account and transaction history showing Schmitt's receipt of payment from publishers of the sexually explicit material.[7] In addition, approximately 40 pages of sexually explicit material, often describing sexual acts involving children, and various correspondence between Schmitt and the publishers of the sexually explicit material further reveal their financial arrangements and the nature of the material.[8]

Schmitt was found guilty of accepting money or any item of value from another inmate, member of his family or his friend, without authorization (offense #25) and demanding or receiving money or anything of value in return for any reason (offense #29).[9] He was sanctioned

---

[4] Certified Administrative Record, pages 39-82. The disciplinary report was the first of three reports issued to Schmitt for essentially the same conduct. A later disciplinary report is the subject of his related civil action in this Court, Schmitt v. Smith, et al., 2004-CV-10451-RWZ.
[5] Id., pages 19-27.
[6] Certified Administrative Record pages 21, 22 and 26.
[7] Certified Administrative Record pages 31-33, 90-91.
[8] Certified Administrative Record pages 35-82.
[9] Certified Administrative Record, page 26.

with 6 weeks loss of television, radio and phone privileges.[10]  Schmitt appealed the finding and sanction to the Superintendent, defendant Peter Allen.[11]  His appeal was denied.[12]

On February 21, 2002, Schmitt received disciplinary report #02-0344, charging him with the following disciplinary offenses:

> #1  disobeying an order, lying to, or insolence toward a staff member;
> #2  violating any departmental rule or any other rule, regulation, or condition of an institution or community based program;
> #8  conduct which disrupts or interferes with the security or orderly running of the institution.[13]

This report indicated that, despite having been warned, Schmitt continued to mail pornographic stories involving children in violation of the rules and regulations of the institution.[14]

On March 20, 2002, a prison disciplinary hearing was convened.[15]  Schmitt refused to attend the hearing.[16]  After considering the report and the submitted materials, the hearing officer found Schmitt guilty of offenses #1 and #2 and sanctioned Schmitt with 10 weeks loss of television, radio and phone privileges.[17]  Schmitt appealed the finding and sanction to the Superintendent, defendant Peter Allen.[18]  His appeal was denied.[19]

---

[10]  Id.
[11]  Id., pages 3-5.
[12]  Id., page 2.
[13]  Complaint paragraph 9 and Exhibit A; Certified Administrative Record of Disciplinary Report 02-0344, pages 9 and 10.  The Certified Administrative Record is submitted separately herewith.  Pages 19-30 of the Record contain the sexually explicit material in issue and those pages are included in the court's copy of the Record but have been removed from a copy provided to Schmitt.
[14]  Id.
[15]  Certified Administrative Record, page 10.
[16]  Id., pages 11 and 14.
[17]  Id., page 13.
[18]  Id., pages 3-4.
[19]  Id., page 2.

5

Schmitt remained at MCI-Cedar Junction until August 9, 2002, when he was transferred to the Massachusetts Treatment Center for the Sexually Dangerous.[20] The same inmate mail regulations applicable to inmates at MCI-Cedar Junction applied to Schmitt at the Treatment Center. Additionally, material is subject to prohibition if it would "interfere with the treatment and rehabilitation process" at the Treatment Center.[21]

The Department inmate mail regulations restrict both incoming and outgoing mail that "jeopardize[s] institutional security, order, rehabilitation, or the public safety" or if it "interfere[s] with institutional goals of security, order, discipline, or if it might facilitate, encourage, or instruct in criminal activity." 103 Code of Mass. Regs. 481.14(1) (outgoing mail); 481.15(2) (incoming mail).[22] The regulations further specifically prohibited mail containing "sexually explicit material that by its nature or content poses a threat to the security, good order, or discipline of the institution" or that "[d]epicts, [d]escribes or encourages activities that may lead to the use of physical violence or group disruption... or encourages or instructs in the commission of criminal activity." 103 Code of Mass. Regs. 481.15(2) (g), (e), (f). The Department inmate property regulations provide that any property that is not approved for retention is contraband. 103 Code of Mass. Regs 403.06.

---

[20] Murphy Affidavit, paragraph 4.

[21] 103 CMR 481.15(3)(b) (effective 4/26/02). This current version of the mail regulations is attached hereto as Exhibit B for the Court's convenience.

[22] A copy of 103 CMR 481.00 et seq. (effective 12/8/00) is attached hereto as Exhibit A for

6

III.     Argument

A.     The Rules and Regulations Prohibiting Schmitt from Possessing or Mailing Sexually Explicit Material Involving Children at MCI-Cedar Junction and Receiving Money for the Material Did Not Violate His First Amendment Rights.

"The fact of confinement and needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration."    Jones v. North Carolina Prisoners' Union, 433 U.S. 119, 125 (1977).    A correctional policy that impinges on an inmate's constitutional rights is valid "if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987).  In Turner, the Supreme Court set forth several factors that "serve to channel the reasonableness inquiry." Thornburgh v. Abbott, 490 U.S. 401, 414, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989).  The four factors are:

> (1) whether there is a rational connection between the restriction and the legitimate governmental interest used to justify it;[23] (2) whether alternative avenues of exercising the right remain open to the inmate; (3) whether accommodation of the right will have an adverse impact on guards, other inmates and prison resources generally; and, (4) whether obvious, easy alternatives to the regulation exist.

Turner, 482 U.S. at 89, 90.[24]

---

the Court's convenience.

[23]     "To show a rational relationship between a regulation and a legitimate penological interest, prison officials need not prove the banned material actually caused problems in the past, or that the materials are 'likely' to cause problems in the future.  See Thornburgh, 490 U.S. at 417.  Moreover, it 'does not matter whether [the court] agree[s] with' the defendants or whether the policy 'in fact advances' the jail's legitimate interests.  See Amatel v. Reno, 156 F.3d at 199. The only question that [the court] must answer is whether the defendants' judgment was 'rational,' that is, whether the defendants might reasonably have thought the policy would advance its interests." Mairo v. Arpaio, 188 F.3d 1059 (9th Cir. 1999).

[24]     This standard has been applied by the Massachusetts Supreme Judicial Court in analyzing prisoner claims.  See Cacicio v. Secretary of Public Safety, 422 Mass. 764, 773 (noting inmate phone regulations do not deny right to effective assistance of counsel and that inmates may make unmonitored telephone calls).

Here, Schmitt appears to challenge the rule prohibiting his possession or mailing of sexually explicit material involving children while serving a sentence for rape of a child at a maximum security correctional institution. Such a restriction has a rational connection to the successful treatment and rehabilitation of inmates, especially sex offenders such as Schmitt.[25] "The Supreme Court has often characterized rehabilitation as one of the primary goals of penal institutions." Amatel v. Reno, 156 F.3d 192, 196 (D.C. Cir. 1998) *cert. denied,* 119 S.Ct. 2365 (1999).

As the Circuit Court in Amatel noted:

"[T]here is a significant body of research showing that long-term exposure to pornography, …can make its male audience more aggressive, more tolerant of violence against women, and more susceptible to myths about rape, such as the notion that women enjoy being raped."

Amatel, 156 F.3d at 200. In the context of a maximum security prison, housing numerous inmates convicted of sexual offenses, there is a rational connection between a ban on sexually explicit material and both rehabilitation and safety.[26] See Powell v. Riveland, 991 F.Supp. 1249, 1251-1253 (W.D. Wash. 1997) (extended discussion of the problems sexually explicit materials cause prison administrators). In addition, the rule is designed to prevent the harassment of female officers and treatment providers and to help preserve institutional security.[27] These reasons have been used to uphold numerous restrictions on the First Amendment rights of inmates. See e.g., Waterman v. Farmer, 183 F.3d 208 (3rd Cir. 1999) (upholding ban on sexually oriented material in correctional treatment center for sex offenders); Mauro v. Arpaio, 188 F.3d 1054 (9th Cir. 1999) cert. denied 529 U.S. 1018, 120 S.Ct. 1419 (2000) (upholding ban on

---

[25] Murphy Affidavit, paragraphs 6-11; Affidavit of John Luongo, paragraphs 6-11. The Luongo Affidavit is submitted separately herewith.
[26] Luongo Affidavit, paragraph 2 and paragraphs 6-11.

8

sexually explicit materials including pictorials that show frontal nudity); <u>Amatel v. Reno</u>, 156 F.3d 192, 196 (D.C. Cir. 1998) <u>cert. denied</u>, 119 S.Ct. 2365 (1999) (upholding ban on sexually explicit material or material featuring nudity).

Schmitt's attempt to draw some distinction or reject categorization of his own writing as "child pornography," "obscenity," or "sexually explicit" is not material to this Court's decision. <u>See</u> <u>Cline v. Fox</u>, 266 F.Supp.2d 489, 496-497 (N.D. Virg. 2003) (rejecting inmate attempts to characterize material as "erotic novels" or "erotic literature" and noting correction officials reasonableness in concluding the policy prohibited the material). Similarly, here - despite Schmitt's protestation that he is merely describing events from his own youth - a review of his writings in both this case and the related action, <u>Schmitt v. Smith, et al.</u>, 2004-CV-10451-RWZ, expose the writings as nothing more a collection of the same type of "graphically described sexual escapades" banned in <u>Cline</u>. <u>Id</u>. The writing clearly is "sexually explicit material" banned by the rules.[28] Prison officials rationally can view Schmitt's writing, involving sexual acts between children, as an added threat to institutional security and order. This is particularly true given Schmitt's history of rape of a child.

Finally, Schmitt ignores the prison rules prohibiting his "giving money or any item of value to, or accepting money or any item of value from another inmate, a member of his family or his friend without authorization" and prohibiting "demanding or receiving money or anything

---

[27]  <u>Id</u>., paragraphs 3 & 8; Murphy Affidavit, paragraphs 3 & 8.

[28]  To this Court and the defendants Schmitt has variously characterized the material as a "coming out" story of "past sexual adventures" (Complaint, paragraph 13); a "sexual story about myself" and "my youthful sexual experience" (Complaint, Exhibit A, Notice of Intent dated March 21, 2002). In a March 4, 2004, letter to the clerk Schmitt found it necessary to include the boxed warning "Attention! Sexually Explicit Material Attached". A copy of the letter is attached hereto as Exhibit C.

9

of value in return for any reason." Such rules rationally relate to the legitimate governmental interest in preventing an inmate from operating a business while incarcerated.

Although "the precise contours of a prisoner's right to free speech are ...obscure," Brewer v. Wilkinson, 3 F.3d 816, 821 (5th Cir. 1993), less obscure is the notion that inmates have no right to conduct a business from behind prison walls. See e.g., French v. Butterworth, 614 F.2d 23, 25 (1st Cir. 1980) *cert. denied*, 446 U.S. 942 (1980) ("[w]hatever protected property or liberty interest the average citizen may have in holding employment or pursuing a chosen occupation, a prisoner has no right to conduct a business while incarcerated."); Garland v. Polley, 594 F.2d 1220, 1222 (8th Cir. 1979) (rejecting claim that prison hobby craft business violated first amendment right to associate for business purposes); Valentine v. Gray, 410 F.Supp. 1394, 1396 (S.D. Ohio 1975) ("[T]he Constitution does not protect an inmate's business activities, whether or not the mails are necessary for the conduct of the enterprise.").[29]

As to the second Turner factor, Schmitt had numerous opportunities to exercise his First Amendment rights. He was free to write compositions and manuscripts concerning any number of events, thoughts, and experiences he wished. The rule only prevented Schmitt from possessing and mailing sexually explicit material and accepting, demanding or receiving money in return for his writings without authorization. See Thornburgh v. Abbott, 490 U.S. 401, 418, 109 S.Ct. 1874 (1989) (ban on all sexually explicit material that poses a threat to security, discipline, and good order satisfies second factor because regulations still permit broad range of

---

[29]    The Federal Bureau of Prisons similarly has a disciplinary rule prohibiting the "giving of money or anything of value to, or accepting anything of value from: another inmate or any other person without staff authorization." 28 CFR 541.13 (Offense #328). In addition, it has a disciplinary rule that prohibits "conducting a business." 28 C.F.R. 541.13 (Offense # 408).

10

publications). Schmitt was free to subscribe to numerous publications, receive books from publishers and other approved sources and a prison library was available to him.[30]

The third and fourth factors also weigh in favor of the defendants. There are no reasonable alternatives to the policy. While some inmates who are sex offenders might not be adversely affected by possessing sexually explicit material, any limited allowance of such material would require a case by case review by professional staff.[31] Neither MCI-Cedar Junction nor the Treatment Center is sufficiently staffed for such reviews.[32] A limited allowance of such material would be ineffective, as prisoners are more than likely to pass their material to other prisoners.[33]

Further, it cannot be said that Schmitt's attempt to run a business from behind prison walls, will not have a significant adverse impact on guards, other inmates and prison resources generally. See Freeman v. State, Dept. of Correction, 4 P.3d 1132, 1136 (Idaho App. Ct. 2000) (case-by-case examination of each inmate's business activity would place a tremendous burden on the prison system). Correctional authorities are in the best position to allocate manpower and resources to maintain a safe and functioning prison with the limited resources available. See, Cacicio, 422 Mass. at 771 (if prison officials could not rely on automated phone message and recording system, they would have to devote scarce resources to develop and maintain alternative methods of maintaining prison security).

---

[30] 103 CMR 403.10(7)(d) (10) (an inmate is authorized to possess a maximum of ten books, magazines, or newspapers); 103 CMR 478.00 et seq. (library resources and materials at all facilities with more than 200 inmates).
[31] Murphy Affidavit, paragraph 11; Luongo Affidavit, paragraph 11.
[32] Id.
[33] Id.

11

Finally, no alternative solutions would accommodate the purported right at a de minimis cost to the Department's valid penological goal. Accordingly, even if Schmitt had some protected right, the Department has imposed reasonable limitations on such right to accommodate legitimate correctional goals.

Accordingly, Schmitt fails to state a First Amendment claim.[34]

    B.    <u>The Rules and Regulations Prohibiting Schmitt from Authoring, Possessing, or Mailing Sexually Explicit Material at the Treatment Center Do Not Violate His First Amendment Rights.</u>

In addition to the above-cited reasons that Schmitt was not entitled to possess and mail sexually explicit material involving children at MCI-Cedar Junction, the unique character of the population at the Massachusetts Treatment Center provides additional support for such a ban at Schmitt's current place of incarceration. Indeed, the inmate mail regulations specifically provide that mail and materials "that may interfere with the treatment and rehabilitation process" at the Treatment Center may be excluded.[35] The restriction has a rational connection to the successful treatment and rehabilitation of sex offenders and the maintenance of order in a facility designed to treat sex offenders.[36]

In a very recent case, the Court of Appeals of Kansas reviewed a correctional policy providing that inmate sex offenders are not permitted to have sexually explicit material in their possession. <u>Hill v. Simmons</u>, 101 P.3d 1286, 2004 Kan. App. LEXIS 1251 (Dec. 10, 2004). In <u>Hill</u>, the Court rejected the inmate's contention that such a rule violated his First Amendment and 14th Amendment due process rights, rather, finding all four of the <u>Turner</u> factors met, the

---

[34]     Article 16 provides no greater rights to Schmitt. <u>See</u> <u>Cacicio v. Secretary of Public Safety</u>, 422 Mass. 764, 774 (1996) (applying federal <u>Turner</u> standard to Article 16 challenge to inmate telephone system).

[35]     103 CMR 481,15(3)(b); Affidavit of Robert Murphy, paragraph 5.

12

Court determined that the restriction was reasonable and rationally connected to legitimate penological interests. Id.

Similarly, Schmitt's First Amendment argument fails in the face of the existing policy at the Massachusetts Treatment Center for the Sexually Dangerous, which prohibits the possession of sexually explicit material.

### C. The Process Used In Connection with Schmitt's Disciplinary Hearings Did Not Violate Any Due Process Rights.

Under the Federal Constitution, an inmate is entitled to the protections of the due process clause only when an existing liberty or property interest is at stake. See Sandin v. Connor, 515 U.S. 472, 484 (1995). A liberty interest is infringed only if the punishment inflicted upon the inmate imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 484 (disciplining prisoner for 30 days in segregated confinement did not represent atypical, significant deprivation).

Here, Schmitt was sanctioned with 6 weeks loss of television, radio and phone privileges on Disciplinary Report 01-1583 and 10 weeks loss of television, radio and phone privileges on Disciplinary Report 02-0344. Such meager sanctions did not impose "atypical and significant hardship in relation to the ordinary incidents of prison life" on Schmitt. See Sandin, 515 U.S. at 484 (thirty days segregated confinement not atypical); Dominique v. Weld, 73 F.3d 1156, 1160-1161 (1st Cir. 1996) (transfer of inmate to a more secure prison does not constitute an atypical, significant deprivation giving rise to a liberty interest protected by the due process clause)); Drayton v. Commissioner of Correction, 52 Mass. App. Ct. 135, 138 (2001) (*citing* Kentucky v. Thompson, 490 U.S. 545, 460 (1989) (federal due process does not give rise to unfettered

---

[36]   Murphy Affidavit, paragraphs 6-11.

13

visitation). Accordingly, Schmitt had no liberty interest to which due process requirements might attach.

Even assuming Schmitt has some protected liberty interest he received all of the process due. Federal due process concerns require that a prisoner facing disciplinary charges that may result in the loss of liberty must receive "(1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and to present documentary evidence in his defense; (3) a written statement by the fact finder of the evidence relied on and the reasons for the disciplinary action." Superintendent, Massachusetts Correctional Institution v. Hill, 472 U.S. 445, 454 (1985) (citing Wolff v. McDonnell, 418 U.S. 539, 563-567 (1974)). There need be only **some** evidence in the record to support the hearing officer's decision. Hill, 472 U.S. at 454.

It is clear from the Administrative Record regarding both disciplinary matter 01-1583 and 02-0344 that each of these due process requirements was met. With regard to disciplinary matter 01-1583, the complaint makes not even a single allegation that due process was violated. Regarding disciplinary matter 02-0344, Schmitt appears to assert that his due process was violated because he may have made a written request for evidence and witnesses.[37] These allegations hardly amount to a due process violation. Schmitt admits he refused to attend the hearing.[38] He also admits he wrote and attempted to mail the sexually explicit story regarding

---

[37] Schmitt claims he is unsure why he refused to attend the hearing, Complaint, paragraph 12, and "tends to believe" he refused to attend because "said requested evidence and witnesses were not present." Complaint, paragraph 20. Schmitt wholly fails to explain what evidence or witnesses he might have offered the absence of which resulted in prejudice. See Banuelos v. McFarland, 41 F.3d 232, 234 (5th Cir. 1995)( regardless of the reasons for witness exclusions, plaintiff still must establish prejudice).

[38] Complaint, paragraph 11; Certified Administrative Record 02-0344, pages 11-12. Schmitt even admits the hearing officer came to his cell to advise him of the hearing. See

children, he simply claims that the writing does not violate the rules.[39] There is no due process requirement of live testimony from the reporting officer, particularly where the accused inmate refuses to attend a hearing. The officer's report and supporting documentation was placed in evidence. Schmitt fails to identify any evidence he purportedly requested and how the denial of such evidence violated his due process. Moreover, it is difficult to imagine such evidence given Schmitt's position that he cannot "be punished for writing sexual stories in personal letters."

The only other substantive claim Schmitt appears to make regarding the conduct of disciplinary hearing 02-0344 itself is that the hearing officer was not impartial because Schmitt had brought several prior legal actions against him. Courts have long rejected the notion that an inmate may successfully claim impartiality of a disciplinary hearing officer simply by filing lawsuits against the officer. See e.g., Redding v. Fairman, 717 F.2d 1105, 1113 (7th Cir. 1983), *cert. denied*, 465 U.S. 1025, 79 L. Ed. 2d 685, 104 S. Ct. 1282 (1984) (inmate's due process right to a fair hearing was not necessarily violated where a member of a disciplinary board was also a named defendant in an unrelated civil suit); Rizzo v. Bureau of Prisons, No. 84-1884, 1985 WL 550, at *3 (S.D.N.Y. Apr. 25, 1985) (prison official named as defendant by plaintiff in another suit not disqualified as hearing officer).

While due process requires an impartial hearing officer, conclusory allegations are insufficient. See McGuinness v. Dubois, 1995 WL 169500 (D.Mass.) (unpublished), aff'd 887 F.Supp. 20 (D.Mass.1996), *rev'd on other grounds, aff'd in part* 75 F.3d 794 (1st Cir. 1996) (complaint challenging impartiality of disciplinary hearing officer fails "[i]n the absence of allegations of specific facts indicating bias or other improper motive"). "The degree of

---

Certified Administrative Record, page 3.
[39] See Certified Administrative Record, pages 3 & 4 (Schmitt states "[t]here is no Federal

15

impartiality required of prison hearing officials does not rise to the level of that required of judges generally." Francis v. Coughlin, 891 F.2d 43, 46 (2d Cir.1989).[40] In his concurring opinion in Wolff, Justice Marshall stated that "due process is satisfied as long as no member of the disciplinary board has been involved in the investigation or prosecution of the particular case, or has had any other personal involvement in the case." 418 U.S. at 592. The Third Circuit has relied on this language to hold that only those who were personally involved with the plaintiff's case must be disqualified from acting as hearing officers. Rhodes v. Robinson, 612 F.2d 766, 773 (3d Cir. 1979). The Seventh Circuit elaborated on this reasoning in holding that mandatory disqualification of every member of a disciplinary committee who was also a named defendant in a suit by the prisoner would be overly burdensome to prison staff. In addition, such a rule would create the potential for abuse by encouraging prisoners to file multiple lawsuits in order to control the composition of a hearing board. Redding v. Fairman, 717 F.2d 1105, 1113 (7th Cir. 1983). The Ninth Circuit has held that a prison officer who participates in the investigation or review, provides testimony concerning, or has personal knowledge of material facts leading to a disciplinary hearing cannot be impartial as matter of law. Clutchette v. Procunier, 497 F.2d 809, 820 (9th Cir.1974), *rev'd on other grounds sub nom.* Baxter v. Palmigiano, 425 U.S. 308 (1976).

Under these principles, Schmitt has not presented a genuine issue of material fact indicating that Hearing Officer Faria was not impartial. Schmitt raised no issues at the hearing or on appeal to the superintendent indicating that Faria had witnessed or investigated the events alleged in the disciplinary report, or that he otherwise had a stake in the outcome of the matter.

---

law or CMR that states I can be punished for writing sexual stories in personal letters."
[40]     Schmitt made the same allegations in Schmitt v. Smith, et al., U.SD.C. C.A. 04-10451-RWZ.

16

See <u>McMaster v. Pung</u>, 984 F.2d 948, 952 (8th Cir.1993) (no evidence of bias where hearing officers were not involved in the incident).

    D.    <u>The Defendants Are Entitled to Qualified Immunity</u>.

All law enforcement officers hailed into court in their individual capacities to respond in damages are entitled to qualified immunity from suit in civil rights actions under §1983, provided their conduct did not violate clearly established statutory or constitutional rights of which a reasonable [police officer] would have known. See <u>Hegarty v. Somerset County</u>, 53 F. 3d 1367, 1372 (1995) <u>quoting</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). In order to determine if a public official is entitled to qualified immunity, courts must determine if the right asserted by the plaintiff is clearly established at the time of the violation. If so, it is appropriate to assume that the defendant official recognized the right and immunity will be denied only if a reasonable official situated in the same circumstances should have understood that the challenged conduct violated that established right. <u>Hegarty</u>, 53 F.3d 1367 at 1373 (citations omitted). Moreover, it should be noted that because qualified immunity is a shield against the burdens of litigation, not merely a defense against liability for money damages, relief on such grounds should take place prior to trial. <u>Id</u>., <u>citing</u> <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985)(deciding case at summary judgment stage).

In the instant case, Schmitt's claim that he was entitled to retain 51 pages of sexually explicit writing in violation of the rules of the Department and institution in which he was located, was not clearly established. Rather, the law as applied to these facts, to the extent it has been established, is in defendants' favor. See e.g., <u>Thornburgh v. Abbott</u>, 490 U.S. 401, 418, 109 S.Ct. 1874 (1989) (ban on all sexually explicit material that poses a threat to security, discipline, and good order satisfies second factor because regulations still permit broad range of

publications); ); <u>Mauro v. Arpaio</u>, 188 F.3d 1054 (9th Cir. 1999) <u>cert</u>. <u>denied</u> 529 U.S. 1018, 120 S.Ct. 1419 (2000) (upholding ban on sexually explicit materials including pictorials that show frontal nudity); <u>Waterman v. Farmer</u>, 183 F.3d 208 (3rd Cir. 1999) (upholding ban on sexually oriented material in correctional treatment center for sex offenders).

IV.   <u>Conclusion</u>

For the foregoing reasons, defendants' motion to dismiss should be allowed or, in the alternative, summary judgment granted in defendants' favor.

Respectfully submitted,
Defendants Patrick Mulvey, William Grossi
Peter Allen, William Faria, Ernest Therien
and the Massachusetts Department of
Correction,

By their attorneys:

NANCY ANKERS WHITE
Special Assistant Attorney General


_____/s/ Philip W. Silva_____
Philip W. Silva, Esq.
Bridgewater State Hospital
20 Administration Road
Bridgewater, Massachusetts 02324
(508)279-4543
B.B.O. No. 548175


I hereby certify that a true copy of the above document was served upon each party appearing pro se by mail on March 31, 2005.


_/s/ Philip W. Silva_____
Philip W. Silva, Esq.